**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MARY WOODS,

    Plaintiff,

        v.

SALISBURY BEHAVIORAL HEALTH,
INC., t/a NEW STORY,

    Defendant.

CIVIL ACTION NO. 3:CV-13-539

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is Defendant Salisbury Behavioral Health, Inc., t/a New Story's ("New Story") Motion for Summary Judgment (Doc. 21) on Plaintiff Mary Woods' ("Woods") claims of discrimination, retaliation, and constructive discharge in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§ 951-963. Specifically, Woods, formerly a special education teacher at New Story, contends that her former employer discriminated against her when she was not selected to fill the newly created school coordinator position, retaliated against her for inquiring about the status of the position after she applied to be the school coordinator, and constructively discharged her when she was forced to resign as a result of the intolerable working conditions in her classroom. New Story's motion for summary judgment will be granted. First, because Woods did not suffer an adverse employment action when she was not selected as school coordinator, she is unable to establish a *prima facie* case of discrimination. Second, as Woods did not engage in protected activity when she inquired about the status of the school coordinator position, New Story is entitled to summary judgment on the retaliation claims. And, because a reasonable person would not have found the conditions at New Story too intolerable to continue working, summary judgment will be granted to New Story on the

constructive discharge claims.

## I. Factual Background[1]

Plaintiff Woods was born on January 30, 1953. (*Plf.'s SMF*, ¶ 1; *Def.'s Answer*, ¶ 1.) Woods has a Bachelor of Science degree in special education and elementary education, and she is certified in both special education and elementary education. (*Def.'s SMF*, ¶ 3; *Plf.'s Answer*, ¶ 3.)   Woods was employed as an emotional support teacher for approximately twenty-eight (28) or twenty-nine (29) years in a public school district. (*Def.'s SMF*, ¶ 4; *Plf.'s Answer*, ¶ 4.)  Thereafter, Woods worked as a learning support teacher for five (5) or six (6) years in a public school district. (*Def.'s SMF*. ¶ 5; *Plf.'s Answer*, ¶ 5.)  She retired from teaching in public school districts in 2007. (*Def.'s SMF*, ¶ 6; *Plf.'s Answer*, ¶ 6.)

After a year of retirement, Woods applied for a position with New Story. (*Def.'s SMF*, ¶ 7; *Plf.'s Answer*, ¶ 7.)  Woods was hired by New Story, and she began her employment with New Story as a special education teacher on March 16, 2009, teaching students ages fourteen (14) to twenty-one (21). (*Def.'s SMF*, ¶ 8; *Plf.'s Answer*, ¶ 8.)  Woods testified that she loves being a teacher. (*Def.'s SMF*, ¶ 9; *Plf.'s Answer*, ¶ 9.)

While employed by New Story, Woods would have five (5) to eight (8) students in her classroom. (*Def.'s SMF*, ¶ 10; *Plf.'s Answer*, ¶ 10.)  There were generally between two (2) and five (5) adult assistants in her classroom. (*Woods Dep.*, 10:9-17.)  Woods' classroom had one paraprofessional. (*Id*. at 11:7.)  The number of paraprofessionals in a classroom depended on what each student's Individualized Educational Program ("IEP") required. (*Id*. at 10:18-24.)   Woods did not know the exact number of paraprofessionals or adult assistants assigned to other classrooms at New Story. (*Def.'s SMF*, ¶ 14; *Plf.'s Answer*, ¶

---

[1]     The facts are taken from the parties' statements of undisputed facts, (Doc. 23, "*Def.'s SMF*"; Doc. 24, "*Plf.'s SMF*"), answers to undisputed statements of facts, (Doc. 27, "*Def.'s Answer*"; Doc. 24, "*Plf.'s Answer*"), and the corresponding exhibits.

14.)

On her April 1, 2010 Annual Performance Evaluation, Woods was noted as having been "a wonderful addition to the New Story team," and that, overall, she did a wonderful job. (*Def.'s SMF*, Ex. 4.)  The only area of improvement referenced in the Performance Evaluation was for Woods to become more consistent with her attendance. (*Id*.)  Woods received a pay increase following that evaluation. (*Def.'s SMF*, Ex. 5.)

At a staff meeting in the fall of 2010, James Hogan ("Hogan"), Director of Education, informed the faculty that New Story was planning on hiring a school coordinator. *(Woods Dep.*, 34:6-11.)  After the meeting, Woods approached Hogan and indicated that she would be interested in the position. (*Id*. at 35:14-21.)  Hogan informed Woods that the position was not fully developed, but he would get back to her when he had more details. (*Id*.)

On or about January 5, 2011, New Story posted an opening for the school coordinator position on Careerbuilder. (*Def.'s SMF*, ¶ 19; *Plf.'s Answer*, ¶ 19; *Plf's SMF*, ¶ 6; *Def.'s Answer*, ¶ 6.)  While the school coordinator position was not primarily a teaching position, its duties included acting "as substitute teacher and provid[ing] classroom support as needed." (*Def.'s SMF*, Ex. 9.)  The position as posted required a Pennsylvania Special Education teaching certificate. (*Id*.)

Woods applied for the school coordinator position on or about January 7, 2011. (*Def.'s SMF*, ¶ 21; *Plf.'s Answer*, ¶ 21.)  It is undisputed that Woods was qualified for the position. (*Hogan Dep.*, 27:5-11.)

On January 11, 2011, Eric Righter ("Righter"), New Story's Human Resources Manager, sent an email to Hogan and Brooke Coatsworth ("Coatsworth"), Clinical Director at New Story. (*Plf.'s SMF*, Ex. 4.)  In that email, Righter wrote: "As a side note, Mary Woods applied via Careerbuilder.  If I understand this position, wouldn't this be a step down for her?  This also raises the question; is there anyone internally that would be a fit?  As for the

resumes, Susan Chase was the only one that truly interested me.  Dana Bux and LeDonne [sic] Volz seem to have a lot of potential, but lack the certification.  Let me know your thoughts." (*Id.*) Coatsworth responded: "[c]orrect Mary is way overqualified.  The only other person that showed interest was Whitney Foran, but she too is overqualified.  Do you have the posting that we can display to post the position internally?  There is no one specifically that we thought of, but that meets the qualifications." (*Id.*)  On January 12, 2011, Coatsworth emailed Righter, noting that Susan Chase ("Chase") met the requirements, but Coatsworth indicated concern that her experience was in drama and dance. (*Plf.'s SMF*, Ex. 6.)  Chase's resume indicates that she received her undergraduate degree in 1979. (*Plf.'s SMF*, Ex. 9.)  Chase was not selected to fill the school coordinator position. (*Plf.'s SMF*, ¶ 12; *Def.'s Answer*, ¶ 12.)  With respect to LeDonna Volz, New Story did not interview her or select her for the position. (*Plf.'s SMF*, ¶ 14; *Def.'s Answer*, ¶ 14.)

On January 12, 2011, Coatesworth sent an email to Righter and Hogan asking "[w]hat happen[s] if we cannot find anyone that we like who is certified?  Since we made that part of the criteria, does that leave us still looking?" (*Plf.'s SMF*, Ex. 10.)  In response, Righter questioned "[i]f this position is supposed to sub for teachers at times, is it required for the sub (or the regular teacher) to be certified?" (*Id.*)

After applying for the position, Woods had a discussion with Righter in either February or March 2011. (*Def.'s SMF*, ¶ 22; *Plf.'s Answer*, ¶ 22.)  According to Woods, she "started to hear that [New Story] was getting ready to hire someone, and that was like maybe February or March.  I called Eric and asked him the status of the position." (*Woods Dep.*, 37:22-38:1.)[2]  Woods then testified:

---

[2]    On February 7, 2011, Righter sent an email to Coatsworth. (*Plf.'s SMF*, Ex. 11.) The subject of the email was "Mary Woods."  Righter asked Coatsworth to call him about Mary. (*Id.*)  Coatsworth responded in the affirmative. (*Id.*)  It is unclear from the record as to the purpose of this conversation and whether it was related

> [Righter] told me that he felt I would be overqualified and the salary would be much less than I was making now, and I said to him, even though this is an administrative position, the salary is less?  He said, yes.  I said, I would still be interested in the position.  I was retired, I was receiving a pension.  I was doing this because I wanted to, I didn't have to.  And I asked him if someone would get back to me, and he said, yes, and then I reiterated, I said, either you, Jim, or Brooke, would one of you get back to me and let me know what's happening with the position, and he said, yes.

(*Id*. at 38:3-15.)

Righter testified that during that conversation he informed Woods that the school coordinator position would pay about $10,000 less than what she was making at the time. (*Righter Dep*., 48:8-12.)  Righter then stated that Woods "was quiet and said, oh, no, I didn't know that, and the conversation had ended there." (*Id*. at 48:12-14.)  While Woods did not specifically say she was no longer interested in becoming school coordinator, Righter believed Woods' reaction to the news about the lower salary for the school coordinator position indicated that she no longer was interested in the position. (*Id*. at 48:15-21; 51:2-10.)  After his conversation with Woods, Righter contacted Hogan to advise him that Woods was no longer interested in the position. (*Hogan Dep*., 25:17-22.)

Following her discussion with Righter, Woods never approached anyone at New Story to further discuss the school coordinator position, (*Def.'s SMF*, ¶ 27; *Plf.'s Answer*, ¶ 27), because she feared repercussions, such as not getting the necessary support in her classroom. (*Woods Dep.*, 51:1-11.)  Woods also testified that she had no reason to believe that the school coordinator position ever paid more than $30,000, and she further agreed that she would have made less money as school coordinator than as a special education teacher. (*Woods Dep*., 56:18-57:15.)

On February 21, 2011, Michelle Smith, Director of Administration at Salisbury Management, Inc., sent Righter and Coatsworth an email asking: "[w]as the School Coordinator Job ever filled?  If so, with who?" (*Plf.'s SMF*, Ex. 13.)  Righter responded: "[n]ot

---

to the school coordinator position.

yet, but we want to remove the Special Education Certification Requirement to make it easier to fill." (*Id.*)

A revised job description for the school coordinator position was issued by New Story on February 28, 2011. (*Plf.'s SMF*, ¶ 21; *Def.'s Answer*, ¶ 21.)  The revised job description modified the position's job duties as well as the minimum educational qualifications for the position from "Bachelor's degree with a Pennsylvania Special Education teaching certificate" to "Bachelor's degree in Special Education or related field." (*Plf.'s SMF*, ¶ 21; *Def.'s Answer*, ¶ 21.)  The same day, Coatsworth emailed New Story CEO Jodi Dill ("Dill").  Coatsworth wrote: "Jessie [Kessler] is back from vacation and is definitely interested in the school coordinator position.  I was just checking into see if you were able to consider more what pay we would offer her, so that I may officially offer her the position." (*Plf.'s SMF*, Ex. 15.)

Ultimately, New Story hired Jessie Kessler ("Kessler") as school coordinator. (*Def.'s SMF*, ¶ 28; *Plf.'s Answer*, ¶ 28.)  Kessler was sought out for the job by Coatsworth, (*Def.'s SMF*, ¶ 30; *Plf.'s Answer*, ¶ 30), even though Kessler never applied for the position. (*Plf.'s SMF*, ¶ 24; *Def.'s Answer*, ¶ 24.)  Kessler was born in 1985 and graduated from Indiana University of Pennsylvania in 2008 with a degree in psychology.  Kessler had no prior experience participating in the IEP process, working with IEP team members, or preparing IEP paperwork. (*Plf.'s SMF*, ¶ 24; *Def.'s Answer*, ¶ 24.)  It is undisputed that Kessler would not have qualified for the position if the Bachelor's degree with a Pennsylvania Special Education teaching certificate requirement had not been eliminated. (*Plf.'s SMF*, ¶ 24; *Def.'s Answer*, ¶ 24.)

During her employment at New Story, Woods and two of her classroom assistants, Randy Lattis ("Lattis") and Michael Crimmins ("Crimmins"), did not get along well. (*Def.'s SMF*, ¶ 34; *Plf.'s Answer*, ¶ 34.)  Woods complained about Lattis and Crimmins, while Lattis and Crimmins complained about Woods. (*Def.'s SMF*, ¶ 35; *Plf.'s Answer*, ¶ 35.)

On April 11, 2011, Lattis sent an email to Coatsworth and Hogan requesting that he be switched out of Woods' classroom. (*Def.'s SMF*, Ex. 13.)  The reasons set forth for the requested transfer included "unsatisfactory attendance by teacher, inability to deliver effective academic instruction, and failure to comprehend the premise of applied behavioral analysis principles." (*Id.*)  Coatsworth's response to Lattis' request provided: "[y]ou can always request a change, that is not a problem.  If all those issues were gone, would you still want a placement change?" (*Plf.'s SMF*, Ex. 20.)  Lattis answered Coatsworth's question as follows:

> If all the issues were gone, I wouldn't mind staying in classroom one.[3]  All I really want is to be able to use my certification that I went back to school for. In classroom one, there are no behaviors because they don't do anything.  I've tried and after so long, I cannot take it anymore.  Bartering with a teacher who has been an educator for 35 years is like preaching to the choir.  I did not want to follow up our ABA/teacher meeting with a request to change, but I'm literally at my breaking point.  I've enjoyed helping out in other rooms because I leave work feeling useful.

(*Plf.'s SMF*, Ex. 21.)

On May 17, 2011, Crimmins also sent an email to Coatsworth and Hogan requesting a classroom change. (*Def.'s SMF*, Ex. 14.)  Crimmins' request was forwarded by Coatsworth to Dill, and Dill then forwarded Crimmins' email to Righter. (*Plf.'s SMF*, Ex. 22.)

On May 19, 2011, Woods met with Dill and Righter. (*Def.'s SMF*, ¶ 15; *Plf.'s Answer*, ¶ 15.)  At that meeting, a variety of issues were discussed.  One issue addressed at the meeting was that two staff members had requested a transfer out of Woods' classroom. (*Def.'s SMF*, Ex. 6.)  Dill suggested that Woods meet with her staff to address the situation, and she offered to have someone sit in on a second meeting if nothing came from the first meeting. (*Id.*)  Woods advised that she would meet with her staff and report back to Hogan. (*Id.*)  They also discussed Woods' attendance for the 2010-2011 school year, and it was

---

[3]     Woods was the teacher assigned to classroom one. (*Plf.'s SMF*, ¶ 29; *Def.'s Answer*, ¶ 29.)

noted that Woods had called-off twelve (12) times that year, and she was late or left early another thirteen (13) times. (*Id*.) Woods was also issued a written warning for absenteeism. (*Def.'s SMF*, Ex. 7.)  That warning was not justified according to Woods because she had permission to leave work early and arrive late to attend medical appointments. (*Woods Dep.*, 24:14-19.)  Also on May 19, 2011, New Story offered Woods a teaching position for that summer. (*Def.'s SMF*, ¶ 43; *Plf.'s Answer*, ¶ 43.)  Woods accepted the position. (*Def.'s SMF*, ¶ 43; *Plf.'s Answer*, ¶ 43.)

Woods also prepared documents noting her concerns with Crimmins and Lattis. (*Plf.'s SMF*, Exs. 29, 30.) For example, on July 22, 2011, Woods created a document listing her concerns about Crimmins. (*Def.'s SMF*, Ex. 16.)  The document was given to Hogan. (*Woods Dep*. at 76:18-24.)  That document notes Crimmins' insubordination, including "[m]aking faces and eye rolling while I am talking with other staff.  On 3 occasions, I turned around to face Mike as I was talking with other staff and saw him with raised eyebrows and/or eye rolling." (*Def.'s SMF*, Ex. 16.) Woods also noted Crimmins' disregard for lesson plans, his failure to engage with students, and his tendency to leave the classroom for extended periods of time. (*Id*.)

After the complaints were made but before the start of the 2011-2012 school year, both Crimmins and Lattis were removed from Woods' classroom. (*Def.'s SMF*, ¶ 41; *Plf.'s Answer*, ¶ 41.)  However, "[w]hen Michael Crimmins and Randy Lattis transferred to other classrooms, Mary Woods' classroom was chronically understaffed." (*Plf.'s SMF*, ¶ 36.) Yet, Woods testified that Crimmins was replaced by Gabby, while Lattis was replaced by someone from another building. (*Woods Dep*., 44:1-45:3.)  At the start of the 2011-2012 school year, Woods testified that there were four staff members in her room, and she did not have difficulties getting along with any of these individuals. (*Id*. at 45:4-11.)

At the beginning of the 2011-2012 school year, one of the staff members in Woods'

classroom, Gabby, was stabbed by a student with a pencil. (*Coatsworth Dep.*, 74:15-19.) The student indicated that he heard voices telling him to kill Gabby. (*Woods Dep.*, 46:10-11.) Although it was explained to Hogan that the student no longer belonged in the classroom, Hogan refused to change the student's protocol. (*Id.* at 46:13-47:7.)

Woods resigned from her employment with New Story on September 7, 2011. (*Def.'s SMF*, ¶ 44; *Plf.'s Answer*, ¶ 44.) By letter sent to Hogan that day, Woods stated: "I regret to inform you that I will be leaving New Story effective September 9th 2011. I apologize for the short notice but because of circumstances beyond my control it is necessary that I make this decision. I enjoyed working at New Story and appreciate the support you have given me over the last two and one half years. My resignation will be effective Friday September 9th, 2011." (*Def.'s SMF*, Ex. 18.)

Prior to resigning, in or about May or June 2011, Woods saw a mental health therapist for anxiety. (*Woods Dep.*, 28:12-29:17.) Woods informed her therapist that she intended to retire in September 2011. (*Id.* at 29:18-22.) Woods also told her therapist she wanted to continue working through the summer because it was double time. (*Id.* at 29:23-30:1.) However, if her anxiety levels had settled down before September 2011, Woods testified that she would have continued working at New Story. (*Id.* at 58:15-22.)

Based on the foregoing, Woods filed a charge of discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission on October 20, 2011. (*Plf.'s SMF*, ¶ 41; *Def.'s Answer*, ¶ 41.) After exhausting her administrative remedies, Woods filed her Complaint in this action on February 26, 2013. (*Compl.*)

Following the completion of discovery, New Story filed the instant motion for summary judgment (Doc. 21), statement of facts (Doc. 23), and supporting brief (Doc. 22) on January 17, 2014. On February 6, 2014, Woods filed her statement of facts (Doc. 24)

and brief in opposition (Doc. 25) to New Story's motion.  On February 20, 2014, New Story filed its reply in further support of its motion. (Docs. 26; 27.)  New Story's motion for summary judgment is thus fully briefed and ripe for disposition.

## II. Discussion

### A.   Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Denal Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010).  The moving party may present its own evidence or, where the non-moving party has the burden of proof,

10

simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57, 106 S. Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)).  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.

**B.      Age Discrimination- Failure to Select as School Coordinator**

Woods first claims that New Story discriminated against her in violation of the ADEA and the PHRA when she was not selected to fill the school coordinator position.[4]   In opposition, New Story argues: (1) Woods did not suffer an "adverse employment" action as required to establish a *prima facie* case of age discrimination; and (2) even if Woods is able to establish a *prima facie* case, she cannot demonstrate that its non-discriminatory reason for not selecting her as school coordinator is merely pretext for discrimination.   Because Woods fails to satisfy her burden of establishing a *prima facie* case of discrimination, I need not consider whether New Story's justification is pretext for discrimination.

The ADEA makes it unlawful "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."   29 U.S.C. § 623(a)(1). Of course, the purpose of this statute is to prohibit age discrimination in employment and "to promote employment of older persons based on their ability rather than age."   29 U.S.C. § 621(b).

To succeed on an ADEA claim, a plaintiff must make a showing either by "(1) presenting direct evidence of discrimination that meets the requirements of Justice O'Connor's concurring opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 261, 104 L. Ed. 2d 268, 109 S. Ct. 1775, 1796 (1989), or (2) presenting indirect evidence of discrimination that satisfies the familiar three-step burden shifting framework identified in *McDonnell Douglas*."   *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 300 (3d Cir. 2004) (footnote omitted, referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).   Where indirect evidence is being relied upon, it is

---

[4]      Because the same legal standard applies to both the ADEA and the PHRA, it is proper to address the claims collectively. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 n.1 (3d Cir. 2005).

appropriate to proceed under the *McDonnell Douglas* analysis. *Id*. Under the *McDonnell Douglas* burden shifting exercise, the burden of persuasion remains upon the plaintiff. *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). Here, the parties agree that the evidence in this case should be analyzed under the *McDonnell Douglas* framework.

To establish a *prima facie* case of age discrimination, the plaintiff must demonstrate (1) she is over forty, (2) is qualified for the position in question, (3) suffered from an adverse employment action, and (4) the person who received the position was sufficiently younger to support an inference of discriminatory intent. *Swain v. City of Vineland*, 457 F. App'x 107, 110 (3d Cir. 2012). Once this is established, the employer then bears the burden of production in order "to identify a legitimate non-discriminatory reason for the adverse employment action." *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009) (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)). "This burden is 'relatively light' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

If the employer satisfies this burden, the third step in the *McDonnell Douglas* analysis shifts the burden of production back to the plaintiff to identify evidence from which a finder of fact could reasonably infer that the employer's proffered rationale is simply pretext for discrimination. *See Burton*, 707 F.3d at 426. To defeat a motion for summary judgment, the plaintiff must make a showing of pretext. *Burton*, 707 F.3d at 426-27 (citing *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008)). "The plaintiff may demonstrate

that the defendant's legitimate nondiscriminatory reason is pretextual by submitting evidence that allows a fact finder to either 1) disbelieve or discredit the employer's justification; or 2) believe discrimination was more likely than not a 'but for' cause of the adverse employment action." *Abels v. DISH Network Serv., LLC*, 507 F. App'x 179, 183 (3d Cir. 2012) (citing *Fuentes*, 32 F.3d at 764).   "Regardless of the method, the plaintiff's evidence must allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination was a 'but for' cause for the adverse employment action." *Id*. (citing *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 177-78, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009); *Smith*, 589 F.3d at 691).

With respect to the *prima facie* case of discrimination, New Story does not dispute that Woods was qualified for the school coordinator position, that she was over forty, or that the person hired as school coordinator, Kessler, was sufficiently younger to permit an inference of discrimination.   New Story contends, however, that Woods did not suffer an adverse employment action when she was not selected to fill the school coordinator position.  I agree.

"The ADEA defines an adverse employment action as discrimination with respect to the 'compensation, terms, conditions, or privileges of employment.'" *Swain v. City of Vineland*, 457 F. App'x 107, 110 (3d Cir. 2012) (quoting 29 U.S.C. § 623(a)(1)).   The adverse employment action "requires 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).   Direct economic harm is probative of adverse employment action, as is conduct that substantially decreases an individual's earning potential or alters his or her working conditions. *Id*. (citing *Durham Life Ins. Co v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999)).  Appellate courts have held that

14

a "purely lateral transfer," standing alone, does not constitute adverse employment action. *See Fallon v. Meissner*, 66 F. App'x 348, 351 (3d Cir. 2003) (citing *Brown v. Brody*, 199 F.3d 446, 455-57 (D.C. Cir. 1999); *Ledergerber v. Strangler*, 122 F.3d 1142, 1144 (8th Cir. 1997); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)).  The Third Circuit has similarly concluded that the refusal to grant a "purely lateral transfer," does not, by itself, amount to adverse employment action under the ADEA. *See id*. at 349 (holding that refusal to grant employee's request to be transferred to an equivalent job in other cities was not adverse employment action for purposes of the ADEA); *see also Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004) ("Non-selection for a position of employment is not always an adverse employment action.  In cases where the sought position is a lateral transfer, without additional material benefits or prestige, it would be improper to conclude that a denial of such a transfer would be a materially adverse action."); *Hennick v. Schwans Sales Enters., Inc.*, 168 F. Supp. 2d 938, 954 (N.D. Iowa 2001) ("Logic suggests that, if making a purely lateral transfer cannot constitute adverse employment action, then failure to make a purely lateral transfer also would not constitute adverse employment action.").  And, an employee's subjective preference for a different position is insufficient to establish an adverse employment action. *See Swain*, 457 F. App'x at 110-11 (citing *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002)); *Mitchell*, 389 F.3d at 183 ("a plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action.").

Here, New Story argues that this action should be analyzed as a failure-to-transfer case, which requires the plaintiff to establish that the employer's action in denying a request to transfer must cause a materially adverse effect on the plaintiff's employment. (Doc. 26, 3.)  New Story maintains that Woods fails to point to any evidence to show that the school

15

coordinator position was better than her teaching position. Rather, New Story emphasizes that the record confirms that the school coordinator position was objectively worse than her teaching position, (*Id*. at 5), and that transfer to that position would have amounted to a demotion. (Doc. 22, 7.)

Woods adamantly objects to New Story's classification of this action as a failure-to-transfer case. Instead, Woods argues that this should be treated as a failure-to-hire case because "failing to hire Mary Woods is the adverse employment action in her *prima facie* case." (Doc. 25, 5-6.) As explained by Woods:

> This case, however, is not a failure to transfer case. New Story posted a listing for a School Coordinator on Careerbuilder, and it was actively seeking candidates for this newly created position. Mary Woods applied for the position, via Careerbuilder, with a resume and letter of interest to Director of Human Resources, Eric Righter, because the job description matched her degree and experience perfectly. Even though Mary Woods was the most qualified candidate for the position, New Story failed to hire her for the job. Instead New Story hired a much younger female applicant with much less experience than Mary Woods. Therefore, failing to hire Mary Woods is the adverse employment action in her *prima facie* case.
>
> . . .
>
> Under New Story's approach, an internal candidate for a posted, open position would have a higher evidentiary burden than an external candidate. An external candidate for a posted, open position could make a *prima facie* case by showing the employer failed to hire him or her. The internal candidate, however, would have to show the position was better (more money, better benefits, more prestige, etc.) than the position which he or she already filled. Because courts do not ask whether the external candidate would be leaving a position which is just as good as the position being sought, the internal candidate should be treated the same. Accordingly, the Court should treat this case as a failure to hire case and find Mary Woods has suffered an adverse employment action.

(*Id*. at 5-6.)

I am not convinced by Woods' reasoning. In cases where an employee seeks a transfer to a new position within the same organization, courts require that the employee demonstrate that the transfer sought would have resulted in a promotion, *i.e.*, that the position was objectively better than his or her current position. *See, e.g., Alvarado v. Texas Rangers*, 492 F.3d 605, 612 (5th Cir. 2007) (denial of lateral transfer not adverse

employment action, but denial of a promotion is an actionable adverse employment action); *Moore v. City of Columbus*, 129 F. App'x 978, 981 (6th Cir. 2005) ("In cases such as this, where an employee wants to transfer to a new position within the same organization, this Court requires the employee to show that the transfer would have been a promotion."); *Mach v. Will County Sheriff*, No. 06 C 3378, 2008 WL 2692018, at *3 (N.D. Ill. July 1, 2008) ("Under Title VII, the denial of a promotion is an actionable adverse employment action, but the denial of a purely lateral transfer is not.").  Indeed, the Third Circuit required the plaintiff to make such a showing in its decision in *Swain v. City of Vineland*, 457 F. App'x 107 (3d Cir. 2012).

In *Swain*, the City of Vineland's police department reinstated its previously-disbanded K-9 unit. *See Swain*, 457 F. App'x at 108.  The plaintiff expressed his interest in being a dog handler, but he was informed that he was not eligible for the position because he lived too far from the police station to qualify for a take-home vehicle, which was a requirement for the job.  A few months later, the police department's captain sent out another request to all officers stating that he was looking for two sergeants interested in being dog handlers. *See id*.  The plaintiff reiterated his interest in the position, but he again was told his application would be rejected because of where he lived. *See id*.  The plaintiff alleged, however, that the captain informed him that his age was "the real reason" he was not selected to be a dog handler. *See id*.  The plaintiff subsequently commenced litigation alleging, among other claims, that the defendant discriminated against him based on age when his application for the K-9 unit was rejected. *See id*. at 109.  The district court granted summary judgment on the plaintiff's age discrimination claim. *See id*.

On appeal, the Third Circuit concluded that the plaintiff failed to produce any evidence that he suffered an adverse employment action when he was not selected to be a dog handler. *See id*. at 110.  According to the Third Circuit, there was no evidence in the

record that the plaintiff suffered "any 'serious and tangible' alterations of his compensation, terms, conditions, or privileges of employment." *Id*. (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).   The court further indicated that because the plaintiff was "already a sergeant in the street crimes unit, the position of sergeant in the K-9 unit would have been a lateral transfer, which in and of itself does not amount to a significant change in employment status." *Id*. (citations omitted).   Moreover, the Third Circuit noted that while the plaintiff claimed that the K-9 unit was a specialized endeavor with better opportunities for career advancement and overtime, he failed to contend that his salary, benefits, or prestige would have changed.   Thus, even if the duties of a K-9 sergeant were different from those of a street crimes sergeant, the Third Circuit emphasized that "there is no indication that these different responsibilities are objectively better (*e.g.*, more prestigious or less burdensome).   In other words, this is not a case where the transfer that was denied would, in effect, have been a promotion.   Indeed, [the plaintiff] relies only upon his subjective preference for the K-9 position, which is insufficient to establish an adverse employment action." *Id*. at 110-11 (citing *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002)).   Accordingly, the Third Circuit affirmed the district court's grant of summary judgment to the defendant. *See id*. at 111.

As with the plaintiff in *Swain*, Woods fails to present any objective evidence that the school coordinator position was better than her job as a special education teacher for New Story such that her rejection for the position can be properly viewed as the denial of a promotion.   The school coordinator position paid approximately $10,000 a year less than Woods' job as a special education teacher, the teaching position had greater responsibilities, and the teaching position required additional educational certification. *Cf. Alvarado*, 492 F.3d at 615 (identifying non-exhaustive list of factors that may be relevant in determining whether a new position is objectively better).   Likewise, the record is devoid of

18

any evidence that Woods' benefits would have changed had she been selected as the school coordinator or that the school coordinator position was more prestigious.

Woods, however, argues that she suffered adverse employment action as a result of the deprivation of "privileges." As stated by Woods: "job opportunities within New Story constitute 'privileges' of employment. When Mary Woods was denied the School Coordinator position, she was denied a 'privilege' of her employment, *i.e.*, access to job opportunities on the basis of ability." (Doc. 25, 5.) Woods further explains that "[b]ecause the School Coordinator position *completely differed* from her teaching position, and might have provided her with a pathway into a career in school administration, New Story's refusal to hire Mary Woods for the position affected her 'conditions' of employment." (*Id.* (emphasis added).) This reasoning is similar to that rejected by the Third Circuit in *Swain*. Simply because the responsibilities of the school coordinator position were "completely" different from those of a special education teacher does not establish that they are objectively better. Moreover, Woods' preference for the school coordinator position because it may have lead to a career in school administration does not demonstrate an adverse employment action. As noted by New Story, Woods did not testify that she sought the position in order to embark on a career in school administration, and Woods further fails to cite any evidence in the record to support her claim that the failure to be selected as school coordinator hindered her career prospects. Thus, the record demonstrates that Woods merely had a subjective preference for the school coordinator position over her teaching position. But, as indicated in *Swain*, the denial of a position for which an employee has a subjective preference without showing that the position is objectively better than his or her current position fails to establish the adverse employment action necessary for a *prima facie* case of discrimination.

Moreover, the record suggests that Woods' request for a new position at New Story

was actually a request for a demotion and not a lateral transfer.  As a result, Woods would have suffered an adverse employment action if she had, in fact, been transferred to the school coordinator position.[5]   In other words, viewing Williams' teaching position and the school coordinator position objectively, a transfer from a special education teacher to the school coordinator at New Story would have been a demotion.   "Clearly, an employer's denial of a transfer request that would have resulted in a reduction in pay and the employee's demotion within the organization, without more, does not constitute an adverse employment action." *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004); *Momah v. Dominguez*, 239 F. App'x 114, 124 (6th Cir. 2007); *see also Wynn v. Paragon Sys. Inc.*, 301 F. Supp. 2d 1343, 1352 (S.D. Ga. 2004) ("Plaintiff points to no authority indicating the failure to demote can constitute an adverse employment action, nor is the Court aware of any case so holding."); *Cuenca v. Univ. of Kansas*, 265 F. Supp. 2d 1191, 1210 (D. Kan. 2003) ("It is uncontested that this position was not a faculty or tenure track position. To view that position as a promotion for plaintiff, or even as a lateral transfer from the faculty, tenure-track position plaintiff already held, would turn academia upside down. The court thus considers this as a failure to demote claim, which under these circumstances, is not actionable under Title VII."). Based on the evidence of record, Woods fails to establish a *prima facie* case that she was discriminated against when New Story did not select her for the school coordinator position.  Summary judgment in New Story's favor is warranted on these claims.

---

[5]     Indeed, had Woods been involuntarily reassigned from her position as a special education teacher to the school coordinator position, the record in this case indicates that such a reassignment would qualify as adverse for purposes of establishing a *prima facie* case of discrimination.

## C.     Retaliation

Woods also asserts claims against New Story for retaliation in violation of the ADEA and the PHRA.

Under the ADEA:

It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d).  The PHRA similarly provides:

It shall be an unlawful discriminatory practice, . . . .

(d) For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

43 Pa. Stat. Ann. § 955(d).  The anti-retaliation provisions of the ADEA and the PHRA are "nearly identical," *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002), and the Third Circuit has indicated that retaliation claims under these statutes are governed by the same set of precedents. *See id*. at 567.

In the absence of direct evidence of discrimination, retaliation claims under the ADEA and the PHRA generally proceed under the *McDonnell Douglas* framework. *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005).  To establish a *prima facie* case of retaliation under the ADEA or the PHRA, a plaintiff must show: "(1) that s/he engaged in a protected employee activity; (2) that s/he was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse action." *Id*. (citing *Fogleman*, 283 F.3d at 567-68).

In moving for summary judgment, New Story argues that Woods fails to establish a

21

*prima facie* case of retaliation because she is unable to provide any evidence that she engaged in protected activity. (Doc. 22, 12.)  According to Woods, however, the evidence establishes a *prima facie* case of retaliation because Coatsworth "was trying to terminate [her] employment in retaliation for contacting Eric Righter and inquiring about the status of the School Coordinator Position.  A fact finder could reasonably conclude there was a causal connection between Mary Woods' inquiry about the status of the School Coordinator position and New Story's institution of disciplinary action against her." (Doc. 25, 13.)

In order to be protected activity, the actions taken by the employee need not have been formal; activities such as making complaints to management or writing critical letters may be protected. *Curay-Cramer v. Ursuline Acad.*, 450 F.3d 130, 135 (3d Cir. 2006). Although context specific, it is the message conveyed by the conduct, not "the means of conveyance" that determines whether the activity is protected. *Id*.  The opposition to the illegal employment practice "must identify the employer and the practice- if not specifically, at least by context." *Id*.

Woods' claim that she engaged in protected activity in this action does not find support in Third Circuit case law.  For example, in *Barber v. CSX Distribution Services*, 68 F.3d 694, 701-02 (3d Cir. 1995), the Third Circuit held that an employee's letter to his employer was not protected conduct because he did not specifically complain about age. Although the letter complained about unfair treatment generally and expressed the employee's dissatisfaction that the position he sought was awarded to someone else, the letter failed to complain specifically about age discrimination. *See id*.  The court reasoned that the letter was "just too vague to support a finding that his job was eliminated because he engaged in behavior that was protected under the ADEA." *Id*. at 702.  Thus, while the letter clearly indicated the plaintiff's dissatisfaction that the position was given to a less qualified individual, "that letter does not explicitly or implicitly allege that age was the reason

for the alleged unfairness.  A general complaint of unfair treatment does not translate into a charge of illegal age discrimination." *Id*.  Thus, the Third Circuit affirmed the district court's order of judgment as a matter of law on the plaintiff's retaliation claim. *See id*.

In view of *Barber*, it is apparent that Woods' inquiry about the status of her application and the school coordinator position fails to constitute protected activity for purposes of establishing a *prima facie* case of retaliation.  Here, there is nothing in the record that Woods identified the alleged illegal practice to Righter during their conversation, nor is there any indication that Woods' age was even referenced during that conversation. Further, there is no evidence that Woods, either explicitly or implicitly, indicated to Righter that age was the true reason her application for the school coordinator position was not accepted. *See Barber*, 68 F.3d at 702.  In fact, it appears that Woods did not even make a general complaint about the school coordinator position hiring process during her conversation with Righter.  Rather, as testified by Woods, she simply inquired about the status of her job application and requested that she be updated about what was happening with the school coordinator position. (*Woods Dep.*, 37:22-38:15.)  Woods therefore did not engage in protected activity, and she is unable to establish a *prima facie* case of retaliation. *See, e.g., Siddigi v. New York City Health & Hosp. Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008) ("Plaintiff claims, in his complaint, that Defendant retaliated against him for inquiring about his promotion application.  Since inquiring about a job application is not a protected activity, Plaintiff fails to make a *prima facie* case.").  New Story's motion for summary judgment on the retaliation claims will be granted.

**D.     Constructive Discharge**

Lastly, Woods claims that she was constructively discharged in violation of the ADEA and the PHRA because the anxiety she experienced as a result of the intolerable working conditions at New Story led to her forced resignation.

The Third Circuit employs "an objective test to determine whether an employee can recover on a claim of constructive discharge . . . [specifically,] whether a reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001) (citation and internal citations omitted); *see also Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993). The Third Circuit has set forth a number of factors, known as the *Clowes* factors, that may be indicative of a constructive discharge: "(1) threat of discharge; (2) suggesting or encouraging resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations." *Lebofsky v. City of Phila.*, 394 F. App'x 935, 939 (3d Cir. 2010) (citing *Clowes*, 991 F.2d at 1161). These factors, however, have not been deemed as an absolute requirement for recovery. *See Duffy*, 265 F.3d at 168.

Here, Woods contends that she was constructively discharged because New Story's failure to take action against Crimmins and Lattis despite her complaints resulted in intolerable conditions in her classroom. Likewise, she argues that "[w]hen these individuals transferred to other classrooms, Mary Woods' classroom was left drastically understaffed." (Doc. 25, 14.) New Story notes in opposition that Woods fails to present any evidence to show that the staffing in her classroom was objectively intolerable. New Story further emphasizes that the staff members which caused the alleged intolerable conditions were removed from Woods' classroom prior to her resignation.

New Story's motion for summary judgment on the constructive discharge claim will be granted. First, pursuant to the *Clowes* factors, Woods was not threatened with discharge, encouraged to resign, demoted or subject to reduced pay or benefits, involuntarily transferred, or had her job responsibilities altered. At most, she had an

"unsatisfactory job evaluation" when she was given a written warning for absenteeism on May 19, 2011. (*Plf.'s SMF*, Ex. 24.)  Notably, though, the same day Woods received that warning, she was offered, and she accepted, a teaching position for the summer. (*Def.'s SMF*, ¶ 43; *Plf.'s Answer*, ¶ 43.)  Thus, the *Clowes* factors, although not dispositive of whether Woods was constructively discharged, counsel against such a finding. *See Duffy*, 265 F.3d at 168.

Second, to the extent that Woods claims that she was forced to resign as a result of Crimmins and Lattis' conduct, it is significant to note that these staff members were transferred to different classrooms before she resigned. (*Def.'s SMF*, ¶ 41; *Plf.'s Answer*, ¶ 41.)  Moreover, while Woods asserts that her issues with Crimmins and Lattis were ignored by New Story management, evidence in the record indicates that on May 19, 2011, Dill advised Woods to meet with her staff to discuss their issues. (*Plf.'s SMF*, Ex. 23.)  Dill also indicated that if a second meeting was necessary, either Righter or someone else would sit in on that meeting. (*Id*.)  And, as noted, Crimmins and Lattis were transferred to different classrooms shortly thereafter and before the beginning of the next school year.

Third, it is unclear from the record how Woods' working conditions became intolerable due to staffing concerns once Crimmins and Lattis were transferred to different classrooms.  During her deposition, Woods indicated that two staff members were assigned to her classroom to replace Crimmins and Lattis. (*Woods Dep*., 44:1-45:3.)  Thus, as Crimmins and Lattis were replaced with other staff members, it is not clear how the alleged staffing issues in Woods' classroom were attributable to their transfers.

Fourth, Woods' claim that her classroom was understaffed (apparently before Crimmins and Lattis were transferred) does not reach the threshold of "intolerable conditions." *See Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) ("[I]ntolerability . . . is assessed by the objective standard of whether a reasonable person

in the employee's position would have felt compelled to resign-that is, whether he would have had no choice but to resign."). For one, it is not clear from the record the number of staff members a classroom requires to be adequately staffed. For example, the number of staff members in Woods' classroom varied at times depending on the needs of the students in that classroom, and there were usually two to five assistants in the classroom at a given time. (*Woods Dep.*, 10:9-17.) Moreover, while Woods testified that her classroom was drastically understaffed compared to other classrooms at New Story, she only indicated that her classroom was "probably" more understaffed than other classrooms. (*Id.* at 40:21-41:1.) Woods stated that she believed that her classroom was understaffed as a result of a "visual thing," based on the numbers of students in other classrooms. (*Id*. at 42:5-12) However, Woods acknowledged that she was not aware of the educational plans of the students in other classrooms or the staffing requirements for the other students. (*Id*. at 42:16-22.) Woods was also unclear about the number of staff members in her classroom in the summer of 2011 when compared to the fall of 2011. (*Id*. at 59:18-60:6.) Based on this evidence, Woods fails to establish that the staffing in her classroom left her no choice but to resign. Thus, while the staffing levels in her classroom may have made her job more stressful and difficult, it did not make it unbearable. *See Duffy*, 265 F.3d at 169 ("Duffy does allege that her department was understaffed and that management deliberately delayed providing needed assistance, thereby making her job more difficult. Duffy's job, however, did not become impossible as a result of these staff shortages. Rather, the shortages simply required her to work longer hours until help arrived. This made her job more stressful, but not unbearable."); *see also Kesselman v. Sanofi-Aventis U.S. LLC*, No. 09-5446, 2012 WL 1079962, at *8 (E.D. Pa. Mar. 30, 2012) ("Stressful, frustrating, and uncomfortable working conditions are insufficient; rather, a plaintiff must demonstrate a pattern of conduct that rises to the threshold of intolerability.").

Finally, Woods' conversation with her therapist in May or June 2011 that she intended to retire in September 2011 after earning double time for the summer supports the conclusion that she was not constructively discharged. (*Woods' Dep.*, 28:12-29:22.) While Woods also testified that she would have continued working at New Story if her anxiety levels subsided, (*Id*. at 58:15-22), her statement expressing an intent to retire in September 2011, the month during which she ultimately resigned, undermines the claim that she was constructively discharged and was forced to resign as a result of the intolerable conditions at New Story. *See, e.g., Duffy*, 265 F.3d at 171 (plaintiff's testimony that her decision to resign was based in part on her son's recent college graduation and her resultant financial ability to leave undermined constructive discharge claim).

Viewing the record in the light most favorable to Woods, she fails to demonstrate that the working conditions at New Story were objectively intolerable.  While Woods perceived her job as stressful, Woods fails to present sufficient evidence upon which a reasonable jury could conclude that the working conditions in Woods' classroom were so intolerable that she could not continuing working and had no choice but to resign.  Therefore, New Story's motion for summary judgment on the constructive discharge claims will be granted.

### III. Conclusion

For the above stated reasons, New Story's motion for summary judgment will be granted in its entirety.  Judgment will be entered in favor of New Story and against Woods on all claims.

An appropriate order follows.

March 12, 2014           /s/ A. Richard Caputo
Date              A. Richard Caputo
                United States District Judge